**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

PSINet Consulting Solutions
Knowledge Services, Inc.,

Plaintiff, Civil No. 01-320 (RHK/JMM)

v.

**MEMORANDUM OPINION AND ORDER**

Saudi Petro Gas Company Limited,
Hussain Anazy, Michael Current and
Barry Keeping,

Defendants.

---

Christopher Johnson, Arter & Hadden LLP, Washington D.C., and Frederick R. Dawe, PSINet Consulting Solutions Knowledge Services, Inc., for Plaintiff.

Renee L. Jackson and Christopher Larus, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, for Defendants.

---

## Introduction

This dispute arises out of the efforts, in early 1999, of a predecessor of Plaintiff PSINet Consulting Solutions Knowledge Services, Inc. ("PSINet Consulting Solutions") to secure a contract for providing technology training services to Saudi Arabian Oil Company ("Aramco") in Saudi Arabia. PSINet Consulting Solutions has filed a three-count Complaint seeking (1) a declaration that an April 25, 1999 Marketing Agreement between itself and Defendant Saudi Petro Gas Company Limited ("SPG") is invalid and



FILED AUG - 1 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD AUG - 1 200
DEPUTY CLERK

unenforceable due to coercion and/or lack of consideration, and/or SPG's failure to perform; (2) a declaration that the individual defendants -- Messrs. Hussain Al-Anazy,[1] Michael Current, and Barry Keeping -- must indemnify PSINet Consulting Solutions if the Saudi Arabian Board of Grievances determines that PSINet Consulting Solutions owes SPG money under the Marketing Agreement; and (3) a preliminary injunction to prohibit the defendants from interfering with PSINet Consulting Solutions' business activities in Saudi Arabia. Presently before the Court is the Defendants' Motion to Dismiss PSINet Consulting Solutions' Complaint. For the reasons set forth below, the Court will grant the motion.

## Background

### I. Factual Background

#### A. The Parties

PSINet Consulting Solutions is one of the world's largest providers of information technology solutions. (Jackson Aff. Ex. 1 (PSINet Consulting Solutions web page).) PSINet Consulting Solutions has thirty-eight offices in the United States and six offices overseas. (Id.) In Minnesota, PSINet Consulting Solutions has an office in Saint Paul and another in Minneapolis. (Id.) PSINet Consulting Solutions is a Texas corporation having its corporate headquarters in Texas. (Jackson Aff. ¶ 2.)

[1] The caption states that this defendant's name is "Hussain Anazy"; he has, however, submitted a declaration stating that his name is "Hussain Al-Anazy." The Court will refer to him as Mr. Al-Anazy in this opinion.

SPG is a limited liability company organized under the laws of the Kingdom of Saudi Arabia. (Al-Anazy Decl. ¶ 1.) SPG has one office, located in Dhahran, Saudi Arabia; it employs about ten individuals. (Id.; Keeping Decl. ¶ 1.) SPG provides marketing and other services (such as handling visa requests, arranging transportation and accommodation, invoicing, accounting, and processing other financial matters) in Saudi Arabia on behalf of companies operating in Saudi Arabia. (Al-Anazy Decl. ¶ 1.)

Al-Anazy, a resident of Saudi Arabia, is the chairman of SPG and has been since the company was founded in February 1998. (Id., ¶¶ 1-2.) Keeping, a Canadian citizen who resides in Saudi Arabia, is SPG's general manager for information technology. (Keeping Decl. ¶¶ 1-2.) Current was SPG's vice president until his employment with SPG ended on December 1, 2000. (Al-Anazy Decl. ¶ 4.) Neither Al-Anazy nor Keeping is an owner of SPG. (Al-Anazy Decl. ¶ 1; Keeping Decl. ¶ 1.)

**B. Dynamic Data Solutions, Inc. and the Aramco Contract**[2]

In 1998, Dynamic Data Solutions, Inc. ("DDS"), the predecessor to Plaintiff, intended to bid on a contract to supply information technology training services to

---

[2] In January 1998, DDS was acquired by a Houston-based information technology firm called CORESTAFF, Inc. and made a part of CORESTAFF's Metamor Solutions business unit. It appears that, despite that acquisition, DDS retained its corporate name and its Minneapolis office. (See Compl. Ex. 2.) On June 15, 2000, PSINet, Inc., a New York corporation with its world-wide headquarters in Ashburn, Virginia, acquired Metamor Worldwide, Inc. (headquartered in Houston, Texas) and renamed that company PSINet Consulting Solutions, Inc. It therefore appears that the Minneapolis office of DDS referenced in Kennefick's Affidavit became the Minneapolis office of PSINet Consulting Solutions referenced on PSINet Consulting Solutions' website.

Aramco in Saudi Arabia. (Kennefick Aff. ¶ 2.) In late 1998, the chief operating officer of DDS, Kevin Kennefick, received a telephone call at his Minneapolis office from Keeping, who stated he was calling on behalf of SPG. (Id.) Keeping allegedly told Kennefick that SPG had been promised Aramco's training contract and would be awarded the contract.[3] (Id.) Keeping allegedly further represented to Kennefick that SPG was interested in partnering with DDS because SPG needed an American partner to do the work. (Id.) In that telephone conversation, Keeping allegedly invited Kennefick to come to Saudi Arabia and meet his colleagues at SPG and representatives of Aramco. (Id.)

On January 14, 1999, Current met in London with Alex Ahmed, an individual whom DDS had retained to help develop new business for DDS in Saudi Arabia and the Middle East. (Ahmed Aff. ¶¶ 2-3.) Ahmed avers that Current told him DDS had no chance of winning the Aramco project without SPG's active assistance because Aramco's decision makers had "promised" this contract to SPG. (Id. ¶ 3.)

On January 15, 1999, Keeping came to Minneapolis and met with Kennefick

---

[3] Keeping allegedly represented to Kennefick that the Saudi Minister of the Interior, Prince Naif bin Abdulaziz, a full brother of the King of Saudi Arabia, held an interest in SPG, and that the award of the Aramco training contract would be decided at the level of Prince Naif. (Kennefick Aff. ¶ 3.) Kennefick avers that, while he "believed that such powerful individuals were able to influence the award of business in that market," he "would have preferred to abandon [DDS's] efforts rather than to become a party to such tactics." (Kennefick Aff. ¶ 3.) Curiously, Ahmed avers that he and Kennefick heard similar statements from Messrs. Al-Anazy and Current during their visit to Saudi Arabia, and "[b]ased upon these representations, promises, and assurances, [DDS] reasonably believed that it would be successful in its dealings with Aramco." (Ahmed Aff. ¶ 5.) Cf. *Hamlet* III, ii 242 ("The lady doth protest too much, methinks.")

regarding a potential business relationship between SPG and DDS. (Kennefick Aff. ¶ 6.) Keeping recalls that the meeting with Kennefick lasted for less than one hour; Keeping also met with a representative from another company in Minnesota that day. (Keeping Decl. ¶ 6.) During the meeting, Keeping again invited Kennefick to come to Saudi Arabia and visit SPG; Kennefick alleges that Keeping described the trip as a "fact-finding opportunity" with "no strings attached." (Kennefick Aff. ¶ 6.) Kennefick avers that he "went along up to a point, by agreeing to continue the discussions in Saudi Arabia." (Id. ¶ 7.) Kennefick claims he was already planning to visit Aramco when Keeping came to Minneapolis and extended the invitation to visit SPG. (Id.)

Around February 15, 1999, Keeping again allegedly telephoned Kennefick in Minneapolis.[4] Keeping allegedly told Kennefick that a letter from DDS was necessary in order to arrange a meeting with a representative of Aramco. (Kennefick Aff. ¶ 8.) The letter, prepared on DDS letterhead, is addressed to the "Saudi Aramco Contracting Department," identifies as its subject "Local Agreement Appointment," and provides in pertinent part as follows:

> This is to inform Saudi Aramco that DDS, Inc., 1700 IDS Center, 80 South 8th Street, Minneapolis, MN 55402, has appointed Saudi Petro Gas Company as an Agent effective January 1, 1999.

---

[4] Ahmed avers that Keeping asked Kennefick on February 5, 2001, for a letter appointing SPG as DDS's local representative. Nothing in Ahmed's affidavit indicates that he was present for or participated in the conversation between Keeping and Kennefick. The Court will not consider paragraph 4 of Mr. Ahmed's affidavit on the ground that it lacks foundation.

> * * * * *
>
> DDS, Inc., will provide fully qualified SAP Training Staff and SAP Training & Education Services to Saudi Petro Gas Company for future business with Saudi Aramco.
>
> For DDS, Inc. with
> Kindness Person Regards [sic],
> /s/
> Kevin Kennefick
> Chief Operating Officer

(Compl. Ex. 2.) Apparently, sometime prior to Kennefick signing this letter, DDS had executed a letter of intent with Software Technology Company Limited ("SoftTech"), another Saudi Arabian company, concerning the possibility that DDS would select SoftTech to serve as DDS's local agent for the Aramco training contract. (Kennefick Aff. ¶ 7.) When Kennefick signed the February 15 letter to Aramco regarding SPG, however, DDS had not signed an agreement appointing SoftTech as its local agent in Saudi Arabia. (Id. ¶ 8.)

### C. Representatives of DDS visit Saudi Arabia

Kennefick visited Saudi Arabia from February 19 through February 21, 1999. SPG obtained the visas necessary for that trip. (Ahmed Aff. ¶ 10.) During that visit, Kennefick and Ahmed met with Current, Keeping and Al-Anazy. (Id. ¶ 5.) Kennefick also met with Aramco's head of contracting and a number of his colleagues. (Kennefick Aff. ¶ 10.) Kennefick avers that when he visited with representatives of Aramco, he "clearly communicated the status of our selection of an agent, namely that we were still

considering both SoftTech and SPG." (Kennefick Aff. ¶ 10.) Kennefick further avers that "there was no attempt made by Mr. Current to correct my assertions of the status between our companies."[5]

Apparently, at some point during Kennefick's visit to Saudi Arabia, he learned that SPG had sent the February 15 agency letter to Aramco's Contracting Department. (Kennefick Aff. ¶ 11.) Kennefick states that he complained about that fact to Current, who allegedly responded that he had been obliged to forward the letter in order to arrange for a meeting with Aramco representatives. (Id.) Kennefick avers that, when he was at the airport and preparing to leave Saudi Arabia, he told Current that DDS had serious reservations about doing any business with SPG.[6] (Id. ¶ 12.) When Kennefick returned to Minneapolis, he called Current and told him that DDS had decided to team with SoftTech rather than SPG. (Id.) DDS submitted a bid on the Aramco project using SoftTech as its local Saudi agent. (Ahmed Aff. ¶ 6.)

---

[5] Kennefick does not indicate whether Current was present, however, when Kennefick stated "on three occasions that [DDS was] evaluating SPG and SoftTech as potential partners on the project." (Kennefick Aff. ¶ 10.)

[6] Ahmed avers that, after meeting with the SPG defendants in Saudi Arabia, Kennefick "concluded that SPG lacked the necessary credentials to serve as DDS's strategic partner for Aramco or any other project and that SPG's owner and management lacked the experience and professionalism PSINet expected of its local representatives." (Ahmed Aff. ¶ 6.) Nowhere in his own affidavit, however, does Kennefick state that he had reached those conclusions. Ahmed cannot have first-hand knowledge of Kennefick's thought processes and, to the extent Kennefick communicated such conclusions to Ahmed, those communications would be hearsay and not properly includable in Ahmed's affidavit.

### D. Negotiation of the Marketing Agreement and the Opening of the Bids for the Aramco Contract

Kennefick avers that he learned from sources inside Aramco that the bids for the training contract would be opened on Monday, April 26, 1999 and that, unless Aramco had received confirmation from SPG that all differences had been resolved over who was DDS's local agent, Aramco would not open DDS's bid.[7] (Kennefick Aff. ¶ 13.) PSINet Consulting Solutions alleges that, on April 7, 1999, Kennefick asked Current to withdraw SPG's complaint against the DDS bid; Current allegedly agreed to do so, but only if DDS agreed to pay SPG a "substantial percentage" of the Aramco project revenues. (Compl. ¶ 18.) Kennefick avers that, at first he tried to "handle SPG" and satisfy Aramco by issuing a letter to Aramco assuming sole responsibility and offering to hold Aramco harmless from any legal liability. (Kennefick Aff. ¶ 14.) Aramco ultimately insisted on a letter from SPG confirming that SPG had no claim against DDS. (Id.)

During the night of Sunday, April 25, SPG and DDS negotiated and executed a Marketing Agreement.[8] Keeping and Current participated on behalf of SPG (both of

---

[7] Ahmed avers that, "[o]n April 3, 1999, an Aramco representative 'unofficially' advised SoftTech that a claim had been filed against DDS and that SoftTech's bid would not be opened unless and until that claim had been settled." (Ahmed Aff. ¶ 7.) Nothing in Ahmed's affidavit indicates that he has first-hand knowledge of any conversation between an Aramco representative and a representative of SoftTech. The Court will disregard this statement as lacking foundation and involving hearsay.

[8] Keeping declares that the concept for the Marketing Agreement originated with DDS, which suggested a separate commission agreement whereby SPG would withdraw its claims against DDS in exchange for a small percentage of the revenue DDS

them in Dhahran, Saudi Arabia). Kennefick (in Las Vegas, Nevada) and Alex Ahmed (in Dhahran) participated on behalf of DDS. (Kennefick Aff. ¶ 15.) Kennefick participated by telephone and facsimile. (Id.) Ahmed alleges that during the negotiations, Current and Keeping intimidated him with threats of bodily injury and threats that he would be held personally responsible for any problems if an agreement was not reached. (Ahmed Aff. ¶ 8.) After the Marketing Agreement had been finalized, SPG prepared a letter to Aramco stating that it had no claims against DDS. Aramco opened the bids on April 26 and awarded the training contract to DDS. The estimated value of that contract is twenty million dollars.

**E. DDS's Alleged Breach of the Marketing Agreement**

The Marketing Agreement provided that SPG would receive 5% of the revenues of the Aramco Project from DDS -- approximately one million dollars. To secure this obligation, the Marketing Agreement also required DDS to issue a bank guarantee for $100,000. DDS tried to arrange for a bank guarantee through a local Minnesota bank but was unable to find one on acceptable terms – that is, one that would not have been unconditionally callable by SPG and would have required SPG to prove that it was entitled to payment. (Kennefick Aff. ¶ 17.)

Ahmed avers that, "once it became apparent the Agreement had defects," Keeping

---

anticipated it would receive under the training contract with Aramco. (Keeping Decl. ¶ 10.)

"resorted to blatant intimidation" to force DDS to give in to SPG's demands. (Ahmed Aff. ¶ 9.) Ahmed specifically claims that Keeping "loitered menacingly in his parked vehicle outside Ahmed's residence in Saudi Arabia," and threatened that Ahmed "would be incarcerated without benefit of any of the normal legal formalities or procedures." (Id.) Ahmed further claims that Keeping threatened to arrange to have him murdered, causing Ahmed "to fear for my life, and ultimately causing me to leave the country to avoid further threats of this nature or their execution." (Id.)

On or about January 15, 2001, after DDS failed to provide the $100,000 bank guarantee to SPG, SPG filed suit in Saudi Arabia against DDS and SoftTech seeking to recover amounts due under the Marketing Agreement. (Cassin Decl. ¶ 5; Al-Anazy Decl. ¶ 11.) PSINet Consulting Solutions has been defending that suit.[9] (Al-Anazy Decl. ¶ 11.)

## II. Procedural History

By a March 16, 2001 letter, Christopher Johnson, counsel for PSINet Consulting Solutions, sent a copy of the Summons and Complaint to the Clerk of Court "to be served

---

[9] Defendants filed translations of two documents that PSINet Consulting Solutions has filed with the Saudi Arabia Board of Grievances. (Cassin Decl. Exs. A & B.) The Court notes that PSINet Consulting Solutions has admitted to the Board of Grievances that SPG was appointed as DDS's agent effective January 1, 1999. (Cassin Decl. Ex. A.) Furthermore, PSINet Consulting Solutions argues to the Board of Grievances that it owes no money to SPG because (a) any obligation to pay SPG was conditioned upon the Aramco contract being awarded to either DDS or SPG; (b) the Aramco contract was awarded to SoftTech, not DDS, and (c) DDS has no relationship with SoftTech. (Id.) Indeed, to the extent SPG has attempted to establish an agency relationship between DDS and SoftTech by presenting a "letter of agreement," DDS has argued that it did not sign the letter and, therefore, is not bound by it. (Id.)

upon Saudi Petro Gas Company, a foreign corporation registered under the laws of the Kingdom of Saudi Arabia." (Doc. No. 2.) After receiving from Mr. Johnson the exhibits referenced in the Complaint, the Deputy Clerk mailed a copy of the summons and complaint to SPG by registered mail on March 23, 2001.

Ronald Pump, an American attorney who serves as a legal advisor to American companies engaged in business in Saudi Arabia, averred on June 14, 2001, that "at the last Grievance Board hearing" he attended in the SPG/ PSINet Consulting Solutions matter, he personally handed two copies of the Summons and Complaint in this action to Al-Anazy – one in his individual capacity and the other in his capacity as an officer of SPG. (Pump Aff. ¶ 5.) For his part, Al-Anazy declared on May 2, 2001 that he had not been personally served with the summons and complaint. (Al-Anazy Decl. ¶ 5.) Al-Anazy further declared that, on or about March 28, 2001, two delivery men came to SPG's office in Dhahran and gave to an SPG secretary envelopes addressed to Al-Anazy, Keeping and Current. (Id.) A few days later, SPG received by regular mail an envelope containing a copy of the Complaint. (Id.) Keeping states that he became aware of this lawsuit through a copy of the Complaint that was either mailed or delivered to SPG's offices.

**Analysis**

Defendants have alleged five grounds for dismissal of PSINet Consulting Solutions' Complaint: lack of personal jurisdiction over the defendants, improper venue,

failure of service of process, the doctrine of international comity, and the doctrine of forum non conveniens. Having carefully reviewed the parties' submissions, the Court concludes that it lacks personal jurisdiction over all of the defendants.

**A. Standard of Decision**

The defendants seek to dismiss this action on the grounds that this Court lacks personal jurisdiction over any of the defendants. "A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating, by a prima facie showing, that personal jurisdiction exists. Stevens v. Redwing, 146 F.3d 538, 543 (8th Cir. 1998). For the purposes of a prima facie showing, the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).

Because courts construe Minnesota's long-arm statutes to extend jurisdiction over non-residents to the maximum extent permitted by the Due Process Clause, the Court's inquiry collapses into a single question of whether the exercise of personal jurisdiction over SPG and the individual defendants would comport with due process. Wessels, Arnold & Henderson v. National Med. Waste, Inc., 65 F.3d 1427, 1431 (8th Cir. 1995).

The requirements of due process are met if a defendant purposefully establishes minimum contacts with the forum state, and the exercise of personal jurisdiction in that state is reasonable. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985). "Purposeful availment" means that the defendant's contacts with the forum state is not random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party. Id. at 475. The district court must consider the defendant's contacts with the forum in the aggregate, not individually, and must look at the totality of the circumstances. Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995).

In evaluating an out-of-state party's contacts with the forum state, the Eighth Circuit calls for the district court to consider the following five factors: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. See Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 857 (8th Cir. 1999); Land-O-Nod Co. v. Bassett Furniture Indus., Inc., 708 F.2d 1338, 1340 (8th Cir. 1983). The first three factors are of primary importance. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994). "Officers' or employees' contacts with a forum state are not to be judged according to the corporation's activities there; rather, each defendant's contacts with the forum state must be assessed individually." Minnesota Mining and Mfg. Co. v.

Rauh Rubber, Inc., 943 F. Supp. 1117, 1122 (D. Minn. 1996) (Tunheim, J.) (citing Calder v. Jones, 465 U.S. 783, 790 (1984); Keeton v. Hustler Magazine, 465 U.S. 770, 781 (1984)). The Court begins its analysis with the business, SPG.

**B. Personal Jurisdiction over SPG**

PSINet Consulting Solutions contends that it "has alleged, and need only allege, specific [personal] jurisdiction" over the defendants.[10] (Pl.'s Mem. Opp'n Mot. to Dismiss at 6 n.2.) Where a plaintiff asserts that the district court has specific personal jurisdiction over a non-resident defendant, due process is satisfied if that "defendant has 'purposefully directed' his activities at residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' the activities." Burger King, 471 U.S. at 472 (internal citations omitted).

The total of SPG's contacts with Minnesota appear to be one brief visit by an SPG employee to the state in January 1999 and several telephone calls by SPG employees to

---

[10] Where the district court's jurisdiction over a non-resident defendant is based on the relationship between the plaintiff's claims and the defendant's forum state activities, the court is said to exercise "specific jurisdiction." Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). By contrast, a court may exercise "general jurisdiction" over a non-resident defendant, despite the fact that the plaintiff's claims do not arise out of or are not related to the defendant's forum state activities, where the defendant's contacts with the forum are "continuous and systematic." Id. at 1280-81 (citing Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414 n.8 (1984)).

Here, despite asserting that it only seeks to establish specific personal jurisdiction against Defendants, Plaintiff alleges that "[w]hat is known is that Defendants did substantial business with PSINet and at least one other business based in Minnesota." (Pl.'s Mem. Opp'n at 8 (emphasis added).) This assertion lacks a record citation and, based upon the Court's review of the record, is wholly unsubstantiated.

DDS's office in Minneapolis in late 1998 and early 1999 prior to Kennefick's visit to Saudi Arabia in mid-February 1999. These contacts were clearly purposeful and directed at DDS which, at the time in question, was a corporation having its principal place of business in Minnesota. The question then becomes whether there is a sufficiently close relationship between the claims asserted by the Plaintiff against SPG and SPG's activities in the state of Minnesota to satisfy traditional notions of fair play and substantial justice.

Count I of the Complaint seeks a declaration that the April 25, 1999 Marketing Agreement is invalid due to coercion, lack of consideration, and failure to provide any legitimate or commercially valuable services. To evaluate the relationship of the cause of action to the non-resident defendant's contacts with the forum in a contract case, a court must consider the parties' prior negotiations, contemplated future consequences, actual course of dealings, and the terms of the contract. Burger King, 471 U.S. at 479. Plaintiff tries to forge a connection between the Marketing Agreement and Minnesota by means of the February 15 agency letter. Plaintiff contends that DDS provided the agency letter to SPG as a result of false representations made by SPG employees in telephone calls directed at Kennefick in Minnesota.[11] (See Kennefick Aff. ¶ 8.) Plaintiff then argues that, but for the agency letter, SPG would not have tried to force DDS to enter into an

---

[11] PSINet Consulting Solutions' claim that SPG obtained the agency letter from DDS under false pretenses is contrary to the position it has taken in the Saudi Arabian proceedings – namely, that DDS did appoint SPG as its local agent effective January 1, 1999, as stated in the February 15 letter.

eleventh-hour Marketing Agreement with SPG in order to salvage DDS's potential business relationship with Aramco.[12] (Kennefick Aff. ¶ 9; Ahmed Aff. ¶ 8.)

Plaintiff's proposed connection between its contract claim and SPG's activities in Minnesota is inadequate to support personal jurisdiction over SPG. There is no dispute that the Marketing Agreement was negotiated and executed in Saudi Arabia. The agreement contemplated that DDS would be compensated by Aramco for providing training services in Saudi Arabia. The Marketing Agreement states that DDS required business development assistance "in Saudi Aramco and in the Kingdom of Saudi Arabia." (Compl. Ex. 1.)

To the extent Plaintiff complains that the Marketing Agreement is unenforceable due to SPG's failure to perform, the contract itself and other evidence clearly indicate that SPG's performance would have occurred in Saudi Arabia. To the extent Plaintiff complains that the contract is invalid due to a lack of consideration, again SPG would have provided something of value in Saudi Arabia in connection with the Aramco contract. To the extent Plaintiff complains of "coercion," it is evident that the allegedly

---

[12] PSINet Consulting Solutions also argues that there is a substantial connection between the Marketing Agreement and Minesota because "SPG entered into a contract with PSINet's Minnesota subsidiary rather than initiating contact with PSINet at its national headquarters in Virginia." (Pl.'s Mem. Opp'n at 7.) That contention is simply counterfactual. At the time the April 1999 Marketing Agreement was being negotiated, PSINet had no affiliation to DDS. PSINet, Inc., did not acquire Metamor Solutions and change its name to PSINet Consulting Solutions until June of 2000. It would therefore have been impossible for SPG to have initiated a contract with PSINet, Inc., at its global headquarters in Virginia.

improper conduct Plaintiff complains of occurred in Saudi Arabia. The threats of "commercially harmful reprisals should [DDS] refuse to sign" the Marketing Agreement were made in Saudi Arabia over two months after SPG initiated its last contact with DDS in Minnesota (Compl. ¶ 4; see also id. ¶ 22 ("Based on SPG's coercion at the time of entering into the Agreement . . . ."). Statements that Current and Keeping allegedly made to DDS's employee Alex Ahmed, threatening him with bodily injury and with being held personally responsible for any problems, were also made in Saudi Arabia. (Ahmed Aff. ¶ 8.) There is no substantial connection between Count I of the Complaint and SPG's actions in Minnesota.

Count II seeks indemnification from the individual defendants and does not pertain to SPG. Count III seeks a preliminary injunction against SPG to prevent it (together with the individual defendants) from interfering with PSINet Consulting Solutions' business relationships in Saudi Arabia. That request for relief arises directly out of and relates directly to conduct that allegedly occurred in Saudi Arabia, not Minnesota. (See Compl. ¶¶ 20, 21; Ahmed Aff. ¶ 9.) Any relationship between Count III of the Complaint and SPG's limited contacts with Minnesota is too attenuated to warrant subjecting SPG to personal jurisdiction in Minnesota on that Count. The Court concludes that it lacks personal jurisdiction over SPG with respect to any count of the Complaint.

### C. Personal Jurisdiction over Al-Anazy

For purposes of its personal jurisdiction analysis, Plaintiff lumps SPG and the

individual defendants together into one collective noun and makes no meaningful distinction between the corporation and the individual defendants. With respect to Al-Anazy, Plaintiff has two brief arguments. Plaintiff first contends that, to the extent the individuals were "responsible for the targeting and soliciting of business from PSINet, . . .closed the contract through targeting and communicating with PSINet in Minnesota, and . . . work[ed] with SPG in furthering the completion of the contract , SPG's ties to Minnesota should be imputed to them as well." (Pl.'s Mem. Opp'n at 14 n.4.) The Court having already determined that SPG's few purposeful contacts with Minnesota do not suffice to establish specific personal jurisdiction over the company with respect to the claims Plaintiff has asserted, there is nothing to "impute" to Al-Anazy. Without imputing to Al-Anazy the conduct of other defendants, there is no evidence that any of Al-Anazy's actions were directed at Minnesota. Plaintiff does not dispute Al-Anazy's statements that he never traveled to Minnesota, never sent mail into Minnesota, and never telephoned Minnesota in connection with the claims asserted in PSINet Consulting Solutions' Complaint. (Al-Anazy Decl. ¶¶ 7-9.) Plaintiff's own affidavits establish that any contact between Al-Anazy and representatives of DDS in 1999 occurred in Saudi Arabia. (Ahmed Aff. ¶¶ 5-6.)

Plaintiff's second argument is that Al-Anazy "directed the purposeful targeting of a Minnesota business . . . was generally responsible for all of the other Defendants' actions, and is the alter ego of SPG." (Pl.'s Mem. Opp'n at 14 n.4.) There is no

evidence from which one could reasonably infer that Al-Anazy is the "alter ego" of SPG. Al-Anazy, however, avers that he is not an owner of SPG. (Al-Anazy Decl. ¶ 1.) Nor is there any evidence from which one could reasonably infer that Al-Anazy "directed the purposeful targeting" of DDS by other defendants or was "generally responsible" for the other Defendants' actions. The Court concludes that it lacks personal jurisdiction over Al-Anazy.

**D. Personal Jurisdiction over Current**

Plaintiff alleges in its Complaint and presents statements in Kennefick's Affidavit that Current made several telephone calls to Minnesota prior to Kennefick's trip to Saudi Arabia. (Compl. ¶ 14.) Even viewing the facts in the light most favorable to Plaintiff, however, "the use of arteries of interstate mail, telephone, railway and banking facilities is insufficient, standing alone, to satisfy due process." Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 656 (8th Cir. 1982). Furthermore, although Plaintiff alleges that Current made misrepresentations to Kennefick during those telephone calls, those misrepresentations are not related to the claims that PSINet Consulting Solutions has asserted against Current, nor do those claims arise out of those misrepresentations. Counts II and III of the Complaint arise out of allegations that Current engaged in coercion during the negotiations on the Marketing Agreement (which occurred in Saudi Arabia) and the intimidation and other unscrupulous conduct he allegedly engaged in after the Marketing Agreement had been signed (which also occurred in Saudi Arabia).

For the reasons set forth above with respect to SPG, the connection between Current's contacts with the forum and the causes of action asserted against him are too attenuated to support asserting personal jurisdiction over Current. The Court therefore concludes that it lacks specific personal jurisdiction over Current.

**E. Personal Jurisdiction over Keeping**

Keeping's contacts with Minnesota are slightly more extensive than Current's in that Keeping actually traveled once to Minnesota and visited with Kennefick for about an hour regarding a possible partnership between SPG and DDS. Assuming for a moment that Keeping's actions in Minnesota – which were undertaken in his capacity as an employee of SPG – are attributable to Keeping individually for purposes of assessing personal jurisdiction, those contacts are not sufficiently related to the causes of actions asserted by Plaintiff against him to make the exercise of personal jurisdiction consistent with traditional notions of fair play and substantial justice.

Count II of the Complaint alleges that Plaintiffs owe a duty of indemnification arising out of the individual defendant's "coercion in compelling [DDS] to sign the Agreement, and their direct and indirect tortious interference with [Plaintiff's] business relations, direct and indirect." (Compl. ¶ 28.) Thus, this claim arises out of Keeping's actions in Saudi Arabia. Count III seeks a preliminary injunction based upon ongoing actions allegedly taken by the individual defendants after the Marketing Agreement had been signed – actions which Plaintiff alleges is resulting in interference with its business

relationships in Saudi Arabia. That cause of action against Keeping individually is also too attenuated to Keeping's contacts with Minnesota. Accordingly, the Court determines that it lacks specific personal jurisdiction over Keeping.[13]

### F. The "Secondary Factors" concerning Personal Jurisdiction

The Court concludes that Plaintiff has failed to establish that the claims asserted against each defendant are sufficiently related to or arise from that defendant's contacts with the forum state (if any) to warrant haling them into court in Minnesota for resolution of those causes of action. Consideration of the "secondary factors" described in Land-O-Nod does not change this conclusion. Minnesota may have an obvious interest in providing a local forum in which residents can litigate claims against non-residents, but Minnesota's interest in providing its residents with a forum cannot make up for the lack of adequate minimum contacts. See Falkirk Min. Co. v. Japan Steel Works, Ltd., 906 F.2d

---

[13] Even if the Court had personal jurisdiction over Keeping and Current, they have not been effectively served with process. Plaintiff relies on the affidavit of attorney Ronald Pump, who avers that another attorney representing Plaintiff asked the Clerk of Court to serve Keeping and Current by certified mail. He asserts that, since Keeping acknowledged receiving the Summons and Complaint by mail, it must have been done via certified mail. Mr. Pump's assumptions lack any factual support in the record. Keeping acknowledged becoming aware of this matter by seeing a copy of the Complaint that had been either mailed or delivered to SPG's business office. There is no evidence in the record suggesting that Keeping received service of process by certified mail. Plaintiff's counsel, Mr. Johnson, filed only one letter with the Court requesting service by certified mail. (Doc. No. 2.) That letter only requested service on the company, SPG; Mr. Johnson did not reference any of the individual defendants. Nor is there any other evidence (such as a receipt or note to the file) reflecting that the Clerk of Court sent documents by certified mail to Keeping or Current. Therefore, dismissal of Current and Keeping would be alternatively appropriate for failure of service of process.

369, 376 (8th Cir. 1990). As for the convenience of the parties, witnesses and documents are located in both Minnesota and Saudi Arabia; therefore, that factor does not clearly favor Plaintiff. The Supreme Court has cautioned that "'[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 115 (1987). Based on the foregoing, the Court will dismiss Plaintiff's complaint for lack of personal jurisdiction.[14]

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. No. 3) is **GRANTED** and the Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 1, 2001

RICHARD H. KYLE
United States District Judge

[14] Because the Court has determined that it lacks personal jurisdiction over the defendants, it is unnecessary to reach the issue of whether the Complaint should be dismissed based upon the doctrine of forum non conveniens. Having considered the record before it, however, the Court believes that Saudi Arabia would be an adequate alternative forum, and that the Defendants would be able to make the showing necessary to warrant dismissal on that ground.

AUG - 1 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# Please forward this announcement to the recipient of this fax.

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500